**ORIGINAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 18 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

MICHAEL FUQUA, as Receiver for CRE )
CAPITAL CORPORATION )
    )
    )
    Plaintiff, )
    )
    )
v. )
    )
    )
ALOTTLE GROUP, LLC, KIMBERLY )
OWENBY LAPIN, ERIC LAPIN, RESORT )
CAPITAL, LLC, SOUTHEAST HOLDINGS, )
LLC, J. TERRY & ASSOCIATES, INC., JULIE )
TERRY, ACTUAL ASSETS RETREAT, LLC )
a/k/a CHI: CONSCIOUS HEALING )
INNOVATIONS, LLC, ROBIN M. )
STUART, CYPRESS STUART, OCEAN )
ASSETS INTERNATIONAL, LLC, AURUM )
ENTERPRISES, INC., PRIMA VISTA )
PROPERTIES, LLC, MARSHA )
CUMMINGS, JENNIFER HESS, SAGE )
EQUITY & CONSULTING, LLC and SHERRY )
SAGEMILLER )
    )
    )
    Defendants )
_____ )

CIVIL ACTION FILE
NO. _____    RWS

1:09-CV-2576

## VERIFIED COMPLAINT

NOW COMES Michael Fuqua, as Receiver for CRE Capital Corporation

("CRE"), and by and through undersigned counsel, files this Complaint against

Alottle Group, LLC, Kimberly Owenby Lapin, Eric Lapin, Resort Capital, LLC,

Southeast Holdings, LLC, J. Terry & Associates, Inc., Julie Terry, Actual Assets

Retreat, LLC a/k/a CHI: Conscious Healing Innovations, LLC, Robin Stuart,

Cypress Stuart, Ocean Assets International, LLC, Aurum Enterprises, Inc., Prima

Vista Properties, LLC, Marsha Cummings, Jennifer Hess, Sage Equity and

Consulting, LLC and Sherry Sagemiller (collectively, the "Defendants") to recover

funds that the Defendants received from CRE, showing the Court as follows:

## **BACKGROUND**

1.   On January 15, 2009, the Securities and Exchange Commission ("SEC")

filed suit in the United States District Court for the Northern District of

Georgia, <u>Securities and Exchange Commission v. CRE Capital Corporation</u>

<u>and James G. Ossie</u>, Civil Action File No. 1:09-CV-0114-RWS (the "SEC

Litigation"), seeking injunctive and monetary relief against James G. Ossie

("Ossie") and the appointment of a receiver for CRE.

2.   The SEC alleged that from April 2008 through January 2009, Ossie and

CRE, a company he controlled, violated the federal securities laws by

fraudulently soliciting and inducing investors to participate in a currency

trading investment program, by selling unregistered securities to investors

and by operating the investment program as a Ponzi scheme.  The SEC

further alleged that Ossie made numerous false statements regarding the use

of the investment funds, the historical rates of return on the investments, and

2

the risk to the investors. Ossie claimed that investors would realize

exorbitant profits from trading United States and Japanese currency

contracts as the exchange rate fluctuates. The investors signed monthly

contracts guaranteeing them a 10% monthly rate of return and paying the

Defendants a monthly commission of 5-15% of the amount invested. While

Ossie did in fact engage in some currency trading, this trading resulted in a

cumulative loss of over $12 million. In fact, CRE was operated as a Ponzi

scheme, using the funds of new investors to pay the principal and supposed

"returns" to earlier investors when such "returns" were not actually earned

and their principal had been lost or otherwise dissipated.

3.    On January 15, 2009, the Court entered a consent order granting a temporary

restraining order and asset freeze against Ossie and CRE. In its Order, the

Court appointed Michael Fuqua as Receiver of CRE (the "Receiver"). The

Order further entered a consent preliminary injunction enjoining Ossie from

further violations of the federal securities laws. (A true and correct copy of

the January 15, 2009 Order is attached hereto as "Exhibit A.")

4.    On June 17, 2009 Ossie filed a Consent to Judgment in the SEC v. Ossie

Litigation, pursuant to a settlement that Ossie reached with the SEC. (A true

and correct copy of the June 17, 2009 Consent is attached hereto as "Exhibit

3

B.") The judgment enjoins Ossie from future violations of the antifraud provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940, yet leaves it up to the Court to determine the amount of the civil penalty, damages and disgorgement award.

5.   On March 17, 2009, Ossie was indicted by a federal grand jury for ten counts of wire fraud. (A true and correct copy of the March 17, 2009 Indictment is attached hereto as "Exhibit C.")

6.   Pursuant to the Indictment, it was alleged that Ossie, "aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully devise and intent to devise a scheme and artifice to defraud investors, by operating a fraudulent "Ponzi" scheme that raised more than $25 million from over 120 investors."

7.   The indictment also alleges that Ossie "employed 'correspondents,' or sales persons, who solicited investments based on these representation in exchange for commissions."

8.   Ossie pleaded guilty to wire fraud and was sentenced to 82 months in federal prison and ordered to pay restitution of $18,761,175. (A true and correct copy of Guilty Plea and Plea Agreement is attached hereto as

"Exhibit D." A true and correct copy of the Judgment against Ossie in the Criminal Case is attached hereto as "Exhibit E.")

9.    As detailed herein, some of the Defendants were paid millions of dollars in commissions to bring in and retain investors. The commission amounts were as high as 16% per month of the amount invested.

10.    Certain of the Defendants, "Alottle Group, Aurum Enterprises, Resort Capital and Sage Equity & Consulting," were placed at the bottom of the list of recipients to receive restitution and the Judge ordered that they may not receive restitution until all other victims are paid in full. (See Exhibit E).

11.    CRE and Ossie were also sued by the Commodities & Futures Trading Commission ("CFTC") arising out of the scheme. (A true and correct copy of the CFTC Complaint is attached hereto as Exhibit F.). The CFTC action has not yet been resolved.

## JURISDICTION AND VENUE

12.    The Receiver has claims against the Defendants, each of whom improperly received, and has wrongfully retained, funds from CRE or who otherwise is obligated to return funds to CRE.

13.    The Defendants transacted business with and obtained and accepted funds from the CRE's Georgia bank accounts.

14.    The Receiver is entitled to sue these individuals and entities in the United
States District Court for the Northern District of Georgia for multiple
reasons: (1) this Court has long-arm jurisdiction over them pursuant to
Georgia's long-arm statute, O.C.G.A. § 9-10-91, due to the tortious acts in
which they participated and committed in Georgia and (2) the Receiver has
the right to sue them under 28 U.S.C. §§ 1962 and 754 in this Court because
he has filed the order appointing him as Receiver in the jurisdictions where
the Defendants reside, if other than the Northern District of Georgia. (True
and correct copies of these filed orders are attached hereto as "Exhibit G.")

15.    This action is ancillary to the receivership. Accordingly, this Court has
jurisdiction over the parties and the subject matter of this action. In re
Alpha Telcom, Inc., et al., No. CV 01-1283-PA, 2004 US Dist. LEXIS 2002
(D. Or. August 18, 2004); Quilling v. Grand Street Trust, et al., No. 3.04 CV
251, 2005 WL 1983879 (W.D.N.C. August 12, 2005).

16.    In addition, this action arises from and is directly related to the SEC
Litigation, which provides for nationwide service of process under federal
securities laws. 15 U.S.C. §§ 77v(a) and 78aa.

17.    Jurisdiction and venue are appropriate in this Court as to all Defendants

pursuant to 28 U.S.C. §§ 1962 and 754, and the Georgia long-arm statute,

O.C.G.A. § 9-10-91.

## THE DEFENDANTS

18.    Through fraudulent transfers, among other things, Defendants have

wrongfully received, and have failed to return, money and property that

rightfully belong to the Receivership.

19.    The Defendants have received and have failed to return money that

rightfully belongs to CRE.

20.    The Defendants were sales agents for CRE.  They received commission

payments for marketing the CRE investment programs and for referring

investors to CRE.  In the CRE structure, the Defendants were called

"Correspondents."

21.    The Defendants recruited investors for CRE by telling potential investors

that their principal was 100% guaranteed and that they were also guaranteed

interest payments of 10% to 20% per month (called "Return on Investment"

or "ROI" in the CRE structure), which amounted to 120% to 240% per

year.

22.    The investor entered into a "30 day Currency Trading Contract" or a "30 day Forex Trading Contract" with CRE. The investor had to invest a minimum of $100,000 for 30 days. CRE promised a monthly return of 10% (See Ex. H), 15% (See Ex. I), or 20% (See Ex. J). CRE also guaranteed the return of principle invested. Id.

23.    The Defendants received a commission for each client they recruited and whom invested in CRE, and for each month that the client's investment remained at CRE. These commission payments ranged from 5-16% per month, and thus 60-192% per year.

24.    The Defendants reaped enormous commissions from the funds that they solicited into the scheme.

25.    By simple calculation, Defendants knew or should have known that to pay investors a guaranteed 10-20% per month and commissions to correspondents of 5-16% per month, CRE had to somehow earn more than 15-36% per month and 180-432% per year on its currency trading, which, by its very nature, was a highly risky investment venture.

26.    These Defendants ignored the obvious red flags raised by CRE's promise of no risk of loss of principal and guaranteed monthly returns and commissions

8

on an investment that by its nature could not be guaranteed and would be
expected to fluctuate widely.

27. These Defendants failed to disclose to the persons that they recruited to
invest, the amount of commissions they were receiving, and that in most
instances, the commissions exceeded the amount of return that was paid on
the investment.

28. These Defendants were paid 5-16% per month return on the investments
made (and lost) by others.

29. These Defendants should not be permitted to retain the ill-gotten gains paid
to them in exchange for recruiting investors to place their funds in this
illegal scheme.

30. Commission payments were made from CRE to Alottle, Resort Capital,
Southeast Holdings, J. Terry & Assoc., Ocean Assets, Actual Assets, Prima
Vista, Aurum and Sage Equity (collectively, the "Entity Defendants.")
Thereafter, the Entity Defendants made payments to Eric Lapin, Kimberly
Lapin, Julie Terry, Robin Stuart, Cypress Stuart, Marsha Cummings,
Jennifer Hess and Sherry Sagemiller (the "Individual Defendants") and/or
the Individual Defendants spent funds from their Entities for their own
personal use.

31.   These Defendants have profited from the CRE Ponzi scheme, receiving

excessive commissions and returns and have profited from the illegal

scheme, and their sales efforts, to the detriment of their friends, family and

colleagues, who have suffered net loss positions.

Alottle Group, LLC, Eric Lapin, Kimberly Lapin, Resort Capital LLC,
Southeast Holdings, LLC

32.   Alottle Group, LLC ("Alottle") is a South Carolina limited liability

company solely controlled by Eric Lapin ("Mr. Lapin") and Kimberly

Owenby Lapin ("Ms. Lapin") (collectively, "Mr. and Ms. Lapin").  Mr. and

Ms. Lapin are the "Managing Partners" of Alottle.

33.   Ms. Lapin is the registered agent of Alottle.

34.   Mr. Lapin is an individual residing in Mt. Pleasant, South Carolina.  Mr.

Lapin is a member of Alottle.

35.   Ms. Lapin is an individual residing in Mt. Pleasant, South Carolina.  Ms.

Lapin is a member of Alottle.

36.   Resort Capital, LLC ("Resort Capital") is a South Carolina limited liability

company.  Eric Lapin is the Registered Agent of Resort Capital.  Resort

Capital is solely controlled by Eric Lapin and/or Kimberly Lapin.

37. Southeast Holdings, LLC ("Southeast Holdings") is a South Carolina limited liability company solely controlled Mr. Lapin.  Southeast Holdings may be served by serving Eric Lapin.

<u>J. Terry & Associates, Inc. and Julie Terry</u>

38. J. Terry & Associates, Inc. ("J. Terry & Assoc.") is a California corporation solely controlled by Julie Terry ("Ms. Terry").

39. Ms. Terry is an individual residing in California.  Ms. Terry controls the actions of J. Terry & Assoc.

40. Ms. Terry has agreed to accept service on behalf of herself and J. Terry & Assoc.

<u>Aurum Enterprises, Inc., Prima Vista Properties, LLC, Marsha Cummings and Jennifer Hess</u>

41. Aurum Enterprises, Inc. ("Aurum") is a California corporation solely controlled by Marsha Cummings ("Ms. Cummings") and Jennifer Hess ("Ms. Hess").

42. Aurum's registered agent is Marsha Cummings.

43. Prima Vista Properties, LLC ("Prima Vista") is a California corporation solely controlled by Marsha Cummings ("Ms. Cummings") and/or Jennifer Hess ("Ms. Hess").

44. Prima Vista's registered agent is Aurum Enterprises, Inc.

45. Ms. Cummings and Ms. Hess are individuals residing in California and they control the actions of Aurum and Prima Vista.

46. Ms. Cummings and Ms. Hess have agreed to accept service on behalf of themselves, Prima Vista and Aurum.

Actual Assets Retreat, LLC a/k/a CHI: Conscious Healing Innovations, LLC, Ocean Assets International, LLC, Robin Stuart and Cypress Stuart

47. Actual Assets Retreat, LLC a/k/a CHI: Conscious Healing Innovations, LLC ("Actual Assets") is a California limited liability company solely controlled by Robin Stuart and Cypress Stuart.

48. Actual Assets' registered agent is Cypress Stuart.

49. Ocean Assets International, LLC ("Ocean Assets") is a California limited liability company solely controlled by Actual Assets, Robin Stuart and/or Cypress Stuart.

50. Ocean Assets' registered agent is Robin Stuart.

51. Robin Stuart is an individual with a residence in Sebastopol, California.

52. Cypress Stuart is an individual with a residence in Sebastopol, California.

53. Upon information and belief, the Stuarts have recently relocated to the East Coast, but have not updated the service information for those companies and their exact whereabouts is unknown.

Sage Equity & Consulting, LLC and Sherry Sagemiller

54.  Sage Equity & Consulting, LLC ("Sage Equity") is a Florida limited liability company solely controlled by Sherry Sagemiller ("Ms. Sagemiller").

55.  Sage Equity's registered agent is Spiegel & Utrera, P.A. and can be served with process at 1840 SW 22nd St, 4th Floor, Miami, Florida 33145.

56.  Ms. Sagemiller is an individual residing in Destin, Florida who controls the actions of Sage Equity.

## STATEMENT OF FACTS

### Offerings and Sales of Securities on Behalf of CRE

57.  The investments sold by Ossie and the Defendants were securities under 15 U.S.C. § 77q and § 78j, and the sales were made in violation of federal securities laws. Ossie, the Defendants and others were selling securities that were not registered with the SEC and were not exempt from registration. CRE, Ossie, and those selling the securities were not registered as securities dealers, brokers, or investment advisors with the SEC, any self-regulatory organization, or any state securities regulatory authority, as was required. Moreover, Ossie, the Defendants and others affiliated with CRE were selling these securities through the misrepresentation and misleading omission of material fact in disclosure materials and oral communications with investors and through fraudulent schemes and manipulative devices

13

that deceived investors.

58.     Without the active solicitation of investors and subsequent sales of securities by the Defendants, Ossie and other agents of CRE, the Ponzi scheme, which defrauded investors of over $18 million, would and could not have occurred.

59.     Ossie and other agents of CRE, including the Defendants, offered and sold at least $27.9 million of securities to more than 140 entities (through which individual investors placed their funds), and whom Ossie and the Defendants led to believe were putting money into actual, legitimate and profitable investments. CRE and the Defendants represented that CRE made a profit by trading United States and Japanese currency as exchange rates fluctuated.

60.     CRE would not accept business from individual investors. Rather, CRE required that all investors be a corporation or a limited liability company.

61.     The Defendants were "Correspondents," who acted as sales agents or referral sources who recruited investors into CRE and were paid commission payments.

62.     CRE, through Defendants, offered "30 Day Currency Trading Contracts" ("Trading Contracts") at a minimum investment amount of $100,000. (True

14

and correct copies of sample Trading Contracts are attached hereto as Exhibits H, I and J)

63. At the end of the Trading Contract, the investors would receive their return on investment ("ROI") and had the option of having their principal returned or entering into a new Trading Contract.

64. Investors with less than the minimum investment of $100,000 were allowed to pool their investment with other investors to reach the $100,000 minimum.

65. CRE and Defendants promised investors a guaranteed ROI of 10% to 20% per month, or 120% to 240% per year, on each of their $100,000 investments. (See Exhibits H through J).

66. CRE paid commissions to its correspondents, the Defendants, on the Trading Contracts. Commissions were paid when a new client signed a Trading Contract for the first time and upon each ensuing monthly renewal of their Trading Contract.

67. The monthly percentage commission paid by CRE to its correspondents varied, but generally ranged between 5% and 16% of the monthly Trading Contract amount, which amounts to 60% to 192% of the invested funds after twelve months.

68.   CRE, through Ossie and the Defendants, told investors that their investment
      in CRE carried little risk because CRE had established a "reserve" fund
      which would not be traded or exposed to any risk and would always be
      available to pay promised interest and redeemed principal should CRE's
      trading activities become unprofitable. The Reserve Fund was supposed to
      contain 30% of all funds invested in CRE.

69.   In reality, the investments were not risk-free and CRE did not maintain a
      reserve account with assets anywhere near sufficient to cover the promised
      ROI or the invested principal.

70.   CRE and Ossie did use a portion of the invested funds to conduct currency
      trading through two separate trading accounts. However, CRE and Ossie's
      trading was not profitable, and in fact, the trading activity resulted in a net
      loss of approximately $12.2 million.

71.   CRE paid approximately $13.5 million to investors and correspondents out
      of the $28.2 million collected from investors.

72.   The funds paid out to investors as the return of principal and supposed
      "ROI" did not come from returns on the investments, as was represented,
      but instead came from money put into CRE by other investors.

16

73.    Without the active solicitation of investors and subsequent sales of securities
       by CRE, through Defendants, the Ponzi scheme, which defrauded investors
       out of over $28 million, would not have occurred.  The extremely high rate
       of commission paid to the Defendants also contributed to the Ponzi scheme
       character of the trading program and very substantially increased the
       investors' losses.

74.    When the Receiver took possession of CRE, CRE's bank and trading
       accounts contained less than $360,000.

75.    Approximately $16 million in investor funds are missing; at least
       $4,052,000 of that amount was transferred from CRE to these Defendants.

**Conduct of the Defendants**

76.    The Defendants were correspondents for CRE and served as a sales agents
       to solicit unsuspecting persons to invest their funds in the CRE Ponzi
       scheme.

77.    Beginning in May 2008 and continuing through January 2009, the
       Defendants offered and sold investment contracts with CRE to investors in
       various states including, but not limited to, South Carolina, North Carolina,
       Connecticut, Alabama, Georgia, Maryland, Nevada, Pennsylvania, Virginia,

Florida, California, Tennessee, Washington, Oregon, Delaware, Iowa, New Jersey, Colorado, Idaho, Missouri, Indiana and the District of Columbia.

78. The Defendants provided materially false information concerning CRE and the proposed investments, including stating that the investments were safe and risk-free. In fact, the investments were a sham and the representations were false.

79. The Defendants represented to investors that their investment would generate a 10% to 20% return per month through CRE's trading of United States and Japanese currency. In fact, CRE lost over $12 million in its currency trading activities, was never profitable and the only way that CRE was able to pay ROI or commissions was by using the new investments of other investors.

80. In essence, CRE was robbing the new investors to pay the Defendants and the older investors. In order to keep the scheme running, CRE needed a constant flow of new investments.

81. The Defendants told investors that their invested money was guaranteed because CRE maintained a "reserve" account with a balance sufficient to cover (1) a full return of principal to all investors, and (2) guaranteed ROI.

82.    In fact, CRE maintained almost no funds in any supposed reserve account and at all times was wholly insufficient to cover the principal amount invested or the "guaranteed" ROI.

83.    The supposed investments in CRE sold by the Defendants offered no protection of investor funds. The excessive unsuitable guaranteed ROI payments and the Defendants' excessive commissions were destined to cause loss. The CRE investment was highly unsuitable to every single person the Defendants solicited.

84.    The Defendants were paid a certain agreed-upon percentage of each Trading Contract they brought in to CRE and a certain agreed-upon percentage for each month that the Trading Contracts were renewed. The percentages paid changed over time.

85.    The money used to pay the commissions to the Defendants constitutes ill-gotten gains from the fraudulent sales of unregistered securities to unsuspecting investors. The Defendants have no legitimate claim to receive or retain the commissions because the commissions were paid to them specifically for their role in causing these illegal sales of the unregistered securities, as described herein, to occur.

86.    The money used to pay the commissions to the Defendants also constitutes a fraudulent transfer under O.C.G.A. § 18-2-70 et. seq. The Defendants' participation in and their role in causing these illegal transactions to occur did not constitute valuable consideration, but instead was wrongful and caused CRE loss and caused and/or contributed to CRE's insolvency.

87.    CRE made these commission payments to the Defendants while CRE was insolvent and without ensuring that CRE received services or other consideration of reasonably equivalent value.

88.    CRE made the commission payments to the Entity Defendants.

89.    In turn, the Entity Defendants made payments to the Individual Defendants or the Individual Defendants spent the funds in the Entity Defendants' accounts for their own personal use.

90.    Neither the Entity Defendants nor the Individual Defendants provided any reasonably equivalent value in exchange for the exorbitant commission payments that they received.

91.    The payments to the Defendants were, accordingly, fraudulent transfers of CRE's assets.

92.    The Defendants are not entitled to retain these funds and are obligated to repay them to CRE so they can be repaid to investors.

<u>Alottle Group, LLC, Resort Capital, Southeast Capital, Eric Lapin and
Kimberly Lapin</u>

93.    Alottle's actions were completely controlled by Mr. and Ms. Lapin.

94.    Mr. and Ms. Lapin and/or Alottle sold investments to approximately 87
investors, many of whom could not afford to lose funds in risky investments.

95.    Mr. and Ms. Lapin and/or Alottle brought into CRE approximately
$17,300,000 from approximately 87 investors.  According to CRE's records
those investors collectively lost approximately $11,468,000 through their
investments with CRE, calculated by subtracting the ROI paid from the total
principal invested.

96.    From May 2008 to January 2009, Alottle was paid commissions of
$2,794,000 for the sale of unregistered CRE investments to Alottle and the
Lapins' clients.

97.    Alottle  received the following amounts from CRE on or about the following
dates:

| Paydate | Comm. Paid |
|---------|-----------|
| 5/22/2008 | $6,000 |
| 5/28/2008 | $6,000 |
| 6/20/2008 | $11,000 |
| 6/23/2008 | $11,000 |
| 6/24/2008 | $6,000 |
| 6/30/2008 | $6,000 |
| 6/30/2008 | $6,000 |
| 7/11/2008 | $12,000 |

| | |
|---------|-----------|
| 7/14/2008 | $12,000 |
| 7/14/2008 | $12,000 |
| 7/16/2008 | $11,000 |
| 7/16/2008 | $12,000 |
| 7/21/2008 | $6,000 |
| 7/21/2008 | $6,000 |
| 7/21/2008 | $6,000 |
| 7/23/2008 | $11,000 |
| 7/24/2008 | $16,000 |

| | |
|---------|-----------|
| 7/25/2008 | $12,000 |
| 7/25/2008 | $11,000 |
| 7/30/2008 | $11,000 |
| 7/30/2008 | $11,000 |
| 7/30/2008 | $6,000 |
| 8/5/2008 | $5,000 |
| 8/6/2008 | $16,000 |
| 8/11/2008 | $16,000 |
| 8/13/2008 | $18,000 |

| Date | Amount | | Date | Amount | | Date | Amount |
|---|---|---|---|---|---|---|---|
| 8/15/2008 | $16,000 | | 9/24/2008 | $8,000 | | 10/20/2008 | $5,000 |
| 8/15/2008 | $12,000 | | 9/26/2008 | $1,000 | | 10/20/2008 | $5,000 |
| 8/19/2008 | $13,000 | | 9/26/2008 | $8,000 | | 10/20/2008 | $5,000 |
| 8/20/2008 | $6,000 | | 9/29/2008 | $8,000 | | 10/21/2008 | $8,000 |
| 8/20/2008 | $6,000 | | 9/29/2008 | $1,000 | | 10/22/2008 | $8,000 |
| 8/20/2008 | $16,000 | | 9/29/2008 | $1,000 | | 10/22/2008 | $5,000 |
| 8/20/2008 | $6,000 | | 9/29/2008 | $8,000 | | 10/24/2008 | $8,000 |
| 8/20/2008 | $16,000 | | 9/29/2008 | $5,000 | | 10/24/2008 | $8,000 |
| 8/20/2008 | $16,000 | | 9/29/2008 | $8,000 | | 10/24/2008 | $8,000 |
| 8/21/2008 | $13,000 | | 9/29/2008 | $8,000 | | 10/24/2008 | $8,000 |
| 8/21/2008 | $5,000 | | 9/30/2008 | $8,000 | | 10/27/2008 | $5,000 |
| 8/25/2008 | $5,000 | | 9/30/2008 | $8,000 | | 10/27/2008 | $8,000 |
| 8/28/2008 | $11,000 | | 10/1/2008 | $8,000 | | 10/28/2008 | $8,000 |
| 8/28/2008 | $11,000 | | 10/1/2008 | $8,000 | | 10/28/2008 | $5,000 |
| 8/29/2008 | $11,000 | | 10/1/2008 | $8,000 | | 10/28/2008 | $8,000 |
| 8/29/2008 | $8,000 | | 10/1/2008 | $8,000 | | 10/28/2008 | $5,000 |
| 8/29/2008 | $8,000 | | 10/1/2008 | $8,000 | | 10/28/2008 | $8,000 |
| 8/29/2008 | $8,000 | | 10/6/2008 | $8,000 | | 10/29/2008 | $8,000 |
| 9/1/2008 | $3,000 | | 10/9/2008 | $8,000 | | 10/29/2008 | $5,000 |
| 9/1/2008 | $1,000 | | 10/10/2008 | $8,000 | | 10/29/2008 | $8,000 |
| 9/3/2008 | $8,000 | | 10/10/2008 | $8,000 | | 10/29/2008 | $8,000 |
| 9/3/2008 | $8,000 | | 10/14/2008 | $8,000 | | 10/30/2008 | $8,000 |
| 9/3/2008 | $8,000 | | 10/14/2008 | $3,000 | | 10/30/2008 | $15,000 |
| 9/4/2008 | $8,000 | | 10/14/2008 | $8,000 | | 10/30/2008 | $8,000 |
| 9/4/2008 | $8,000 | | 10/14/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/5/2008 | $8,000 | | 10/14/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/8/2008 | $8,000 | | 10/14/2008 | $5,000 | | 11/3/2008 | $8,000 |
| 9/9/2008 | $8,000 | | 10/15/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/12/2008 | $3,000 | | 10/16/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/12/2008 | $8,000 | | 10/16/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/12/2008 | $8,000 | | 10/17/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/12/2008 | $8,000 | | 10/17/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/12/2008 | $8,000 | | 10/17/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/16/2008 | $1,000 | | 10/17/2008 | $8,000 | | 11/3/2008 | $8,000 |
| 9/18/2008 | $8,000 | | 10/17/2008 | $8,000 | | 11/6/2008 | $8,000 |
| 9/18/2008 | $5,000 | | 10/20/2008 | $5,000 | | 11/6/2008 | $8,000 |
| 9/18/2008 | $5,000 | | 10/20/2008 | $8,000 | | 11/7/2008 | $8,000 |
| 9/18/2008 | $5,000 | | 10/20/2008 | $5,000 | | 11/7/2008 | $8,000 |
| 9/22/2008 | $5,000 | | | | | | |

| Date | Amount | | Date | Amount | | Date | Amount |
|---|---|---|---|---|---|---|---|
| 11/10/2008 | $8,000 | | 11/24/2008 | $20,000 | | 12/4/2008 | $20,000 |
| 11/10/2008 | $20,000 | | 11/24/2008 | $8,000 | | 12/4/2008 | $8,000 |
| 11/12/2008 | $8,000 | | 11/24/2008 | $8,000 | | 12/5/2008 | $8,000 |
| 11/12/2008 | $8,000 | | 11/25/2008 | $8,000 | | 12/5/2008 | $8,000 |
| 11/13/2008 | $8,000 | | 11/25/2008 | $15,000 | | 12/5/2008 | $8,000 |
| 11/14/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/8/2008 | $8,000 |
| 11/14/2008 | $3,000 | | 11/26/2008 | $8,000 | | 12/8/2008 | $8,000 |
| 11/14/2008 | $8,000 | | 11/26/2008 | $5,000 | | 12/9/2008 | $20,000 |
| 11/14/2008 | $8,000 | | 11/26/2008 | $5,000 | | 12/9/2008 | $8,000 |
| 11/14/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/9/2008 | $8,000 |
| 11/14/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/10/2008 | $8,000 |
| 11/14/2008 | $5,000 | | 11/26/2008 | $8,000 | | 12/11/2008 | $8,000 |
| 11/17/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/11/2008 | $8,000 |
| 11/17/2008 | $5,000 | | 11/26/2008 | $5,000 | | 12/11/2008 | $8,000 |
| 11/17/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/12/2008 | $8,000 |
| 11/17/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/12/2008 | $8,000 |
| 11/17/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/12/2008 | $8,000 |
| 11/18/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/15/2008 | $8,000 |
| 11/18/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/15/2008 | $5,000 |
| 11/18/2008 | $8,000 | | 11/26/2008 | $8,000 | | 12/15/2008 | $8,000 |
| 11/19/2008 | $8,000 | | 12/2/2008 | $8,000 | | 12/15/2008 | $8,000 |
| 11/20/2008 | $8,000 | | 12/2/2008 | $8,000 | | 12/15/2008 | $8,000 |
| 11/20/2008 | $8,000 | | 12/2/2008 | $5,000 | | 12/15/2008 | $8,000 |
| 11/20/2008 | $8,000 | | 12/2/2008 | $8,000 | | 12/15/2008 | $8,000 |
| 11/20/2008 | $5,000 | | 12/2/2008 | $8,000 | | 12/15/2008 | $5,000 |
| 11/20/2008 | $8,000 | | 12/2/2008 | $8,000 | | 12/16/2008 | $8,000 |
| 11/20/2008 | $5,000 | | 12/2/2008 | $8,000 | | 12/16/2008 | $8,000 |
| 11/20/2008 | $5,000 | | 12/2/2008 | $8,000 | | 12/16/2008 | $8,000 |
| 11/20/2008 | $15,000 | | 12/2/2008 | $15,000 | | 12/16/2008 | $8,000 |
| 11/21/2008 | $8,000 | | 12/2/2008 | $8,000 | | 12/17/2008 | $8,000 |
| 11/21/2008 | $5,000 | | 12/2/2008 | $10,000 | | 12/17/2008 | $5,000 |
| 11/21/2008 | $8,000 | | 12/3/2008 | $15,000 | | 12/17/2008 | $8,000 |
| 11/21/2008 | $8,000 | | 12/3/2008 | $8,000 | | 12/18/2008 | $8,000 |
| 11/21/2008 | $8,000 | | 12/3/2008 | $8,000 | | 12/18/2008 | $30,000 |
| 11/24/2008 | $8,000 | | 12/3/2008 | $15,000 | | 12/18/2008 | $8,000 |
| 11/24/2008 | $8,000 | | 12/3/2008 | $15,000 | | 12/18/2008 | $8,000 |
| 11/24/2008 | $8,000 | | 12/3/2008 | $8,000 | | 12/19/2008 | $8,000 |
| 11/24/2008 | $8,000 | | 12/4/2008 | $8,000 | | 12/19/2008 | $5,000 |

| | | | | |
|---|---|---|---|---|
| 12/19/2008 | $40,000 | | 12/31/2008 | $5,000 |
| 12/19/2008 | $5,000 | | 12/31/2008 | $8,000 |
| 12/19/2008 | $5,000 | | 12/31/2008 | $8,000 |
| 12/19/2008 | $15,000 | | 12/31/2008 | $8,000 |
| 12/19/2008 | $8,000 | | 12/31/2008 | $15,000 |
| 12/22/2008 | $8,000 | | 12/31/2008 | $8,000 |
| 12/22/2008 | $5,000 | | 1/2/2009 | $7,800 |
| 12/22/2008 | $8,000 | | 1/2/2009 | $7,800 |
| 12/22/2008 | $8,000 | | 1/2/2009 | $14,800 |
| 12/22/2008 | $8,000 | | 1/2/2009 | $8,000 |
| 12/22/2008 | $16,000 | | 1/2/2009 | $7,800 |
| 12/23/2008 | $7,800 | | 1/2/2009 | $7,800 |
| 12/23/2008 | $8,000 | | 1/2/2009 | $7,800 |
| 12/23/2008 | $20,000 | | 1/2/2009 | $7,800 |
| 12/23/2008 | $8,000 | | 1/2/2009 | $7,800 |
| 12/23/2008 | $20,000 | | 1/2/2009 | $19,800 |
| 12/23/2008 | $8,000 | | 1/2/2009 | $7,800 |
| 12/23/2008 | $8,000 | | 1/2/2009 | $7,800 |
| 12/24/2008 | $8,000 | | 1/5/2009 | $15,000 |
| 12/24/2008 | $8,000 | | 1/5/2009 | $7,800 |
| 12/26/2008 | $8,000 | | 1/5/2009 | $19,800 |
| 12/26/2008 | $5,000 | | 1/5/2009 | $7,800 |
| 12/26/2008 | $8,000 | | 1/5/2009 | $7,800 |
| 12/26/2008 | $8,000 | | 1/5/2009 | $7,800 |
| 12/26/2008 | $8,000 | | 1/6/2009 | $7,800 |
| 12/26/2008 | $15,000 | | 1/6/2009 | $7,800 |
| 12/26/2008 | $8,000 | | 1/8/2009 | $7,800 |
| 12/26/2008 | $8,000 | | 1/8/2009 | $7,800 |
| 12/29/2008 | $8,000 | | 1/8/2009 | $7,800 |
| 12/29/2008 | $5,000 | | **TOTAL** | **$2,794,600** |
| 12/29/2008 | $8,000 | | | |
| 12/29/2008 | $8,000 | | | |
| 12/29/2008 | $5,000 | | | |
| 12/29/2008 | $8,000 | | | |
| 12/29/2008 | $8,000 | | | |
| 12/29/2008 | $8,000 | | | |
| 12/29/2008 | $8,000 | | | |
| 12/29/2008 | $8,000 | | | |
| 12/29/2008 | $8,000 | | | |

98. Alottle then made numerous transfers from its bank accounts to the Lapins' personal bank accounts at Bank of America and Charles Schwab.

99. The Lapins also made various payments out of their Alottle accounts for personal expenses and the payment of credit cards.

100. Alottle and the Lapins owe the Receiver at least $2,794,000.

101. The Receiver made demand to Alottle and Mr. and Ms. Lapin for the return of these funds. (A true and correct copy of the Receiver's demand letter to Alottle is attached hereto as "Exhibit K.") Alottle and Mr. and Ms. Lapin have failed to return any of the money they received.

102. Resort Capital received $100,000 in payments of supposed ROI from CRE. It also received transfers from the Alottle bank accounts.

103. Southeast Capital received $22,500 in commission payments from CRE through Alottle.

<u>J. Terry & Associates, Inc. and Julie Terry</u>

104. J. Terry & Assoc.'s actions were controlled by Ms. Terry.

105. From June 2008 to January 2009, CRE paid commissions of $805,400 to J. Terry & Assoc. CRE also paid $20,000 in excess ROI to J. Terry & Assoc.

106. J. Terry & Associates paid the amounts it received in commissions to Ms. Terry and to a third party.

107. A third party received $327,132.87 in commissions from CRE, through J. Terry & Associates and has agreed to repay all such amounts to the Receiver and thus is not named in this suit.

108. Ms. Terry received the remaining $478,267.13 in commissions from CRE, through J. Terry & Associates. J. Terry & Assoc. and Ms. Terry owe the Receiver at least $478,267.13.

109. The Receiver made demand to Ms. Terry and J. Terry & Assoc. for the return of these funds.

110. Ms. Terry and J. Terry & Assoc. have been unable to return to the Receiver any of the commission payments they received due to an inability to pay but have agreed to enter into a Consent Judgment for $478,267.13.

<u>Actual Assets Retreat, LLC a/k/a CHI: Conscious Healing Innovations, LLC, Ocean Assets, LLC, Robin Stuart and Cypress Stuart</u>

111. Ocean Assets' and Actual Assets' actions were completely controlled by Robin Stuart and Cypress Stuart.

112. Robin Stuart, Cypress Stuart, and/or Actual Assets brought into CRE approximately $1,650,000 from approximately 6 investors. Those 6 investors collectively lost approximately $1,236,000 through their

26

investments with CRE, calculated by subtracting the ROI paid to them from the principal amounts that they invested.

113.    From July 2008 to December 2008, CRE paid $164,000 in commissions to Actual Assets.

114.    CRE paid the following amounts to Actual Assets on or about the following dates:

| Paydate | Comm. Paid |
|---|---|
| 8/25/2008 | $5,000 |
| 9/18/2008 | $5,000 |
| 9/22/2008 | $5,000 |
| 9/25/2008 | $5,000 |
| 9/30/2008 | $14,000 |
| 10/15/2008 | $5,000 |
| 10/22/2008 | $5,000 |
| 10/22/2008 | $5,000 |
| 10/31/2008 | $12,000 |
| 10/31/2008 | $5,000 |
| 11/19/2008 | $3,500 |
| 11/21/2008 | $3,500 |
| 11/21/2008 | $17,500 |
| 11/21/2008 | $3,500 |
| 12/2/2008 | $10,500 |
| 12/2/2008 | $3,500 |
| 12/19/2008 | $3,500 |
| 12/19/2008 | $3,500 |
| 12/19/2008 | $3,500 |
| 12/22/2008 | $17,500 |
| 12/22/2008 | $3,500 |
| 12/24/2008 | $3,500 |
| 12/31/2008 | $10,500 |
| 12/31/2008 | $10,500 |
| | $164,000 |

115.    In turn, Actual Assets, paid some or all of those amounts to Robin Stuart and/or Cypress Stuart.

116.  From July 2008 to December 2008, CRE paid $18,000 to Ocean Assets in commissions and $140,000 in ROI on its $100,000 investment.

117.  CRE paid the following amounts in commissions to Ocean Assets on or about the following dates:

| Paydate | Comm. Paid |
|---------|-----------|
| 6/23/2008 | 14,000.00 |
| 8/21/2008 | 4,000.00 |
| TOTAL | 18,000.00 |

118.  In turn, Ocean Assets, paid some or all of those amounts to Robin Stuart and/or Cypress Stuart.

119.  Robin Stuart, Cypress Stuart, Ocean Assets and/or Actual Assets owe the Receiver at least $222,000.

120.  The Receiver made demand to Actual Assets, Ocean Assets, Robin Stuart and Cypress Stuart for the return of these funds.  (A true and correct copy of the Receiver's demand letter to is attached hereto as "Exhibit L.")

121.  Actual Assets, Ocean Assets, Robin Stuart and Cypress Stuart have failed to return to the Receiver any of the commission payments they received.

<u>Aurum Enterprises, Inc., Prima Vista Properties, LLC,
Marsha Cummings and Jennifer Hess</u>

122.  Aurum's and Prima Vista's actions were completely controlled by Marsha

Cummings and Jennifer Hess.

123.  From July 2008 to January 2009, CRE paid $4,000 in commissions to Prima

Vista and $170,000 on its $100,000 investment.

124.  From July 2008 to January 2009, CRE paid $182,000 in commissions to

Aurum.  In turn, Aurum paid some or all of these commissions to Marsha

Cummings and/or Jennifer Hess.

125.  Marsha Cummings, Jennifer Hess and/or Aurum owe the Receiver at least

$266,000.00

126.  The Receiver made demand to Aurum, Prima Vista, Marsha Cummings and

Jennifer Hess for the return of these funds.

127.  Aurum, Prima Vista, Marsha Cummings and Jennifer Hess have been unable

to return to the Receiver any of the commission payments they received due

to an inability to pay but have agreed to enter into a Consent Judgment for

$266,000.

<u>Sage Equity and Consulting, LLC and Sherry Sagemiller</u>

128.  Sage Equity's actions were completely controlled by Sherry Sagemiller.

129. Sherry Sagemiller and/or Sage Equity brought into CRE approximately $1,600,000 from approximately 9 investors. Those 9 investors collectively lost approximately $1,200,000 through their investments with CRE.

130. From October 2008 to January 2009, CRE paid $84,600 in commissions to Sage Equity for the sale of unregistered CRE investments.

131. Sage Equity was paid the following amounts on about the following dates:

| Paydate | Comm. Paid |
|---------|-----------|
| 10/17/2008 | $5,000 |
| 10/17/2008 | $5,000 |
| 11/17/2008 | $5,000 |
| 11/19/2008 | $5,000 |
| 12/2/2008 | $10,000 |
| 12/5/2008 | $4,800 |
| 12/5/2008 | $5,000 |
| 12/9/2008 | $5,000 |
| 12/16/2008 | $5,000 |
| 12/16/2008 | $5,000 |
| 12/19/2008 | $5,000 |
| 12/23/2008 | $5,000 |
| 12/30/2008 | $10,000 |
| 1/5/2009 | $4,800 |
| 1/5/2009 | $5,000 |
| **Total** | **$84,600** |

132. In turn, Sage Equity paid some or all of those amounts to Sherry Sagemiller.

133. Sherry Sagemiller and/or Sage Equity owe the Receiver at least $84,600.

134. The Receiver made demand to Sage Equity and Sherry Sagemiller for the return of these funds. (A true and correct copy of the Receiver's demand letter to Sage Equity et. al. is attached hereto as "Exhibit M.")

135.   Sage Equity and Sherry Sagemiller have failed to return to the Receiver any of the commission payments they received.

## CAUSES OF ACTION

## COUNT I – FRAUDULENT TRANSFER (O.C.G.A. § 18-2-70 et seq.)

136.   The Receiver incorporates and re-alleges paragraphs 1 through 135 as if set forth fully herein.

137.   Despite promises to keep investor funds in CRE accounts to use in trading United States and Japanese currency, Ossie and other representatives of CRE directed the transfer of nearly all of the funds out of CRE's bank accounts unrelated to supposed investments.

The Transfers to Defendants Constitute "Fraudulent Transfers" under Georgia Law

138.   As a result of these transfers, CRE was left with assets unreasonably small in amount and value in relation to the business in which it was engaged and the obligations it owed and contributed to its insolvency.

139.   CRE was operated as a Ponzi scheme, as a direct and intended result of which caused CRE to incur debts to investors and other obligations far beyond CRE's ability to repay such obligations.

140.   As a Ponzi scheme, CRE was insolvent from inception and was insolvent at the time of the transfers to Defendants.

31

141. Salespersons who extend the fraud of a Ponzi scheme by recruiting new investors do not provide the Ponzi scheme with reasonably equivalent value in exchange for the commissions paid to the salesperson.

142. CRE was operating as a Ponzi scheme and as such, as a matter of law, did not receive consideration of any value, much less reasonably equivalent value, in exchange for the transfers to Defendants.

143. CRE paid $2,794,000 from CRE to Mr. and Ms. Lapin and/or Alottle as commission payments for recruiting investors.

144. Mr. and Ms. Lapin and/or Alottle received $2,794,000 from CRE as commission payments for recruiting investors.

145. Southeast Holdings received $22,500 in commission payments from CRE through payments to Alottle.

146. Resort Capital received $100,000 in supposed ROI from Alottle and received various transfers from Alottle from the commissions that Alottle was paid.

147. CRE paid $805,400 to J. Terry & Assoc. as commission payments for recruiting investors and $20,000 in excess returns.

148. In turn, J. Terry & Assoc. paid $327,132.87 in commission payments to a third-party, who has agree to repay the funds to the Receiver.

149. J. Terry & Assoc. paid Ms. Terry $478,267.13 or she spent such amounts for her own use.

150. CRE paid $164,000 to Actual Assets as commission payments for recruiting investors.

151. In turn, Action Assets paid those amounts to Robin Stuart and Cypress Stuart or they spent such amounts for their own use.

152. CRE paid $58,000 to Ocean Assets as commission payments for recruiting investors and excess returns.

153. In turn, Ocean Assets paid those amounts to Robin Stuart and Cypress Stuart or they spent those funds for their own use.

154. CRE paid $182,000 to Aurum as commission payments for recruiting investors.

155. CRE paid $74,000 to Prima Vista as commission payments for recruiting investors and excess return.

156. In turn, Prima Vista paid those amounts to Robin Stuart and Cypress Stuart or they spent those funds for their own use.

157. CRE paid $84,600 to Sage Equity as commission payments for recruiting investors.

158. In turn, Sage Equity paid those amounts to Sherry Sagemiller or they spent those funds for their own use.

159. The Receiver made a demand for the return of funds from the Defendants, but they have failed and refused to repay the amounts owed to the Receivership.

160. Defendants are liable to the Receivership for the funds that they received from CRE, plus interest at the legal rate since the time of receipt.

## COUNT II UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST

161. The Receiver incorporates and re-alleges paragraphs 1 through 160 as if set forth fully herein.

162. As set out above, CRE transferred approximately over $4 million to Alottle, Resort Capital, Southeast Holdings, J. Terry & Assoc., Ocean Assets, Actual Assets, Prima Vista, Aurum and Sage Equity (collectively, the "Entity Defendants").

163. The Entity Defendants then transferred the commission payments in the amounts specified herein to Eric Lapin, Kimberly Lapin, Julie Terry, Robin Stuart, Cypress Stuart, Marsha Cummings, Jennifer Hess and Sherry Sagemiller (the "Individual Defendants").

164. The Individual Defendants caused the Entity Defendants they controlled to distribute some or all of the commission payments received from CRE to themselves.

165. The amounts paid to the Individual Defendants are proceeds that were unlawfully obtained from investors by CRE. Accordingly, the commissions paid to and received by the Defendants are impressed with constructive trust.

166. The Individual Defendants received the funds as commissions on the investments of their "clients."

167. The Individual Defendants did not convey any item of value or perform any services for the legitimate benefit of CRE in exchange for the transfers from CRE.

168. The Defendants accepted, retained, and wrongfully benefited from the transfers from CRE.

169. It would be inequitable for the Defendants to retain the funds they received from CRE.

170. The Defendants have been unjustly enriched.

171. The Receiver is entitled to recover the amounts transferred to the Defendants.

172. The Receiver is entitled to recover prejudgment interest from the Defendants from the date of the receipt of such funds.

## **COUNT III – MONEY HAD AND RECEIVED**

173. The Receiver incorporates and re-alleges paragraphs 1 through 172 as if set forth fully herein.

174. As set forth above, CRE transferred over $4 million in commission payments to the Entity Defendants.

175. The Entity Defendants then transferred the funds to the Individual Defendants.

176. Upon information and belief, the Individual Defendants caused the Entity Defendants they controlled to distribute the money received from CRE to themselves.

177. The amounts paid to the Defendants are proceeds that were unlawfully obtained from investors by means of artifice and fraud.
Accordingly, the commissions received by the Defendants are impressed with constructive trust.

178. The Defendants received the funds as commissions on the investments of their "clients."

36

179.   The Defendants did not invest the funds received from CRE for the benefit
       of CRE, but instead have retained the funds for their own use and have
       supplied no benefit to CRE.

180.   CRE has been insolvent since its inception.

181.   CRE is the rightful owner of these funds and, in turn, owes payments to its
       investors.

182.   The Defendants have refused to return the funds in their possession that
       belong to CRE despite the Receiver's demand for return of the funds.

183.   As a direct and proximate cause of the Individual Defendants' failure to
       return the funds in their possession that belong to CRE, CRE has been
       damaged.

184.   The Defendants are liable to CRE for the amounts that each received.

### COUNT IV – ATTORNEYS' FEES AND EXPENSES
### PURSUANT TO O.C.G.A. § 13-6-11
(As to All Defendants except not Julie Terry, J. Terry & Assoc., Inc.,
Aurum Enterprises, Inc., Prima Vista Properties, LLC,
Marsha Cummings and Jennifer Hess)

185.   The Receiver incorporates and re-alleges paragraphs 1 through 184 as if set
       forth fully herein.

186.   These Defendants have acted in bad faith, been stubbornly litigious, and
       caused the Receiver unnecessary trouble and expense.

187.    Accordingly, the Receiver, on behalf of CRE, is entitled to recover his

attorneys' fees and expenses incurred in this action.

WHEREFORE, the Receiver respectfully prays that:

(a)    The Court award to the Receiver, on behalf of the Receivership,

damages in the following amounts:

(i)    As to Alottle Group and Kimberly and Eric Lapin, at

least $2,784,000 plus interest at the rate of $533.91/day

accruing from February 16, 2009 or the earliest day

allowed by law.

(ii)    As to Resort Capital, at least $100,000 plus interest at the

rate of $19.17/day accruing from filing or the earliest day

allowed by law.

(iii)    As to Southeast Holdings, at least $22,500 plus interest at

the rate of $4.31/day accruing from July 27, 2009 or the

earliest day allowed by law.

(iv)    As to J. Terry & Associates, Inc.: $498,267.13.

(v)    As to Julie Terry: $498,267.13.

(vi)    As to Actual Assets Retreat, LLC a/k/a CHI: Conscious

Healing Innovations, LLC, at least $164,000 plus interest

at the rate of $31.45/day accruing from February 16, 2009  or the earliest day allowed by law.

(vii)     As to Ocean Assets, at least $58,000 plus interest at the rate of $11.12/day accruing from February 16, 2009 or the earliest day allowed by law.

(viii)    As to Robin Stuart and Cypress Stuart, at least $222,000 plus interest at the rate of $42.57/day accruing from February 16, 2009 or the earliest day allowed by law.

(ix)      As to Aurum Enterprises, Inc., Prima Vista Properties, LLC, Marsha Cummings and Jennifer Hess: $266,000.

(x)       As to Sage Equity and Consulting, LLC and Sherry Sagemiller, at least $84,600 plus interest at the rate of $16.22/day accruing from February 16, 2009 or the earliest day allowed by law.

(b)    That the Court impose all costs of this action, including reasonable attorneys' fees, on the Defendants set forth in Count IV, and on behalf of CRE;

(c)    That the Court award the Receiver prejudgment interest on all

damages at the highest rate allowed by law against the Defendants set

forth above; and

(d)    That the Court award to the Receiver, on behalf of CRE, such other

and further relief as the Court deems just and proper.

Respectfully submitted this 18th day of September 2009.

Thomas S. Richey
Georgia Bar No. 604525
Tom.Richey@bryancave.com
Jennifer D. Odom
Georgia Bar No. 549717
Jennifer.Odom@bryancave.com
Ann W. Ferebee
Georgia Bar No. 431941
Ann.Ferebee@bryancave.com

BRYAN CAVE POWELL GOLDSTEIN
One Atlantic Center – Fourteenth Floor
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 572-6600

Attorneys for Michael Fuqua,
Receiver for CRE Capital
Corporation

::5489107/3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MICHAEL FUQUA, as Receiver for CRE CAPITAL CORPORATION | ) ) ) | |
| | ) | CIVIL ACTION FILE |
| Plaintiff, | ) ) | NO. _____ |
| | ) | |
| v. | ) ) | |
| | ) | |
| ALOTTLE GROUP, LLC, KIMBERLY OWENBY LAPIN, ERIC LAPIN, RESORT CAPITAL, LLC, SOUTHEAST HOLDINGS, LLC, J. TERRY & ASSOCIATES, INC., JULIE TERRY, ACTUAL ASSETS RETREAT, LLC a/k/a CHI: CONSCIOUS HEALING INNOVATIONS, LLC, ROBIN M. STUART, CYPRESS STUART, OCEAN ASSETS INTERNATIONAL, LLC, AURUM ENTERPRISES, INC., PRIMA VISTA PROPERTIES, LLC, MARSHA CUMMINGS, JENNIFER HESS, SAGE EQUITY & CONSULTING, LLC and SHERRY SAGEMILLER | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |

## **VERIFICATION**

Personally appeared before the undersigned officer authorized by law to

administer oaths, Michael Fuqua, who, after being duly sworn, deposes and states:

I have read the Verified Complaint attached hereto and testify that the facts

contained therein are true and correct.

41

This concludes my testimony.

This _18th_ day of September 2009.

_Michael Fuqua_
Michael Fuqua

Sworn to and subscribed before me this
_18th_ day of September 2009.

_A. Cheryl McMillan_
Notary Public

My Commission Expires: _____

A CHERYL MCMILLAN
NOTARY PUBLIC
FULTON COUNTY, GEORGIA
MY COMMISSION EXPIRES OCTOBER 14, 2012